UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JACK WINFIELD THRASHER,

                              Plaintiff,          12-CV-0880(MAT)

              v.                                  **DECISION**
                                                  **and ORDER**
CAROLYN W. COLVIN, Commissioner
of Social Security,[1]

                              Defendant.

_____

## INTRODUCTION

     Jack Winfield Thrasher ("Plaintiff"), brings this action
pursuant to 42 U.S.C. § 405(g) seeking review of the final decision
of the Commissioner of Social Security ("the Commissioner") denying
his application for Disability Insurance Benefits ("DIB").

     Presently before the Court are the parties' motions for
judgment on the pleadings pursuant to Rule 12(c) of the Federal
Rules of Civil Procedure. Dkt. ##8, 11.

## BACKGROUND

     Plaintiff filed a DIB application on May 13, 2008, alleging
disability beginning May 1, 2007,[2] due to traumatic brain injury
("TBI") and vitamin B-12 deficiency. T. 28, 147-50, 163. His
initial application was denied, and a hearing was subsequently
requested before an Administrative Law Judge ("ALJ"). T. 68-72.

_____

     [1] Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal
Rules of Civil Procedure, Carolyn W. Colvin should therefore be
substituted for Michael J. Astrue as the defendant in this suit.

     [2] Plaintiff later amended the onset date to November 15, 2005.

Plaintiff appeared with counsel before ALJ Bruce R. Mazzarella in Buffalo, New York, on December 7, 2010. The ALJ also heard testimony from a vocational expert. T. 26-67.

In applying the familiar five-step sequential analysis as contained in the administrative regulations promulgated by the Social Security Administration, see 20 C.F.R. §§ 404.1520, 416.920; Lynch v. Astrue, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps), the ALJ found: (1) Plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 15, 2005; (2) he had the severe impairments of TBI with mild cognitive loss and vitamin B-12 deficiency; (3) his impairments did not meet or equal the Listings set forth at 20 C.F.R., Part 404, Subpart P, Appx. 1, and that he retained the residual functional capacity ("RFC") to perform work at all exertional levels, except that he was limited to simple, repetitive, and routine tasks with little in the way of changes in work assignments, and was limited to 1 and 2-step instructions or tasks that could be reduced to checklist form; (4) Plaintiff was not able to return to his past relevant work; and (5) based in part upon the vocational expert testimony and using the Medical-Vocational Guidelines, there existed jobs in significant numbers in the national economy that Plaintiff could perform. T. 12-20. The ALJ then concluded that Plaintiff was not disabled as defined in the Act. T. 20-21.

The ALJ's determination became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on July 20, 2012. T. 1-4. This action followed. Dkt.#1.

The Commissioner moves for judgment on the pleadings on the grounds that substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled. Comm'r Mem. (Dkt. #9) 19-24. Plaintiff has filed a cross-motion alleging that the ALJ improperly applied the treating physician rule, erroneously assessed Plaintiff's credibility, and should have found Plaintiff disabled at step five of the sequential analysis. Pl. Mem. (Dkt. #11-1) 9-15.

## DISCUSSION

### I.   Scope of Review

A federal court should set aside an ALJ decision to deny disability benefits only where it is based on legal error or is not supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted).

### II.  Medical Evidence

#### A.   Prior to November 15, 2005

Plaintiff had an auto accident in 1967 resulting in a TBI that left him unconscious for eight weeks. T. 223, 227, 255. The

accident also resulted in one of his legs being shorter than the other. T. 256.

Psychiatrist Hilary Tzetzo evaluated Plaintiff on October 27, 2005, shortly before his alleged onset date of disability, at the request of his employer. T. 254-58. At work, Plaintiff was described as having memory problems, disheveled appearance, and irritable, and as a result he was sent a certified letter informing him of these problems. T. 254. He denied, however, that these problems had been ongoing for over a year. Id.

Plaintiff's memory was "a concern," but he had not seen any mental health professional or counselor and denied psychiatric history. T. 254. He had an "excellent academic history" and excellent vocabulary. He told Dr. Tzetzo that he hoped he did not have a mental health problem and that there was a physical reason for his work problems. T. 255.

The mental status examination revealed that Plaintiff was cooperative, attentive, alert, and fully oriented with adequate eye contact. T. 256. His grooming was moderate, at best, his jeans were not fully zipped, but he was not malodorous. Id. Plaintiff scored 29 out of 30 on a mini-mental status exam, indicating normal cognition. Id. He recalled 7 digits forward and 5 back, but could only recall 1 of 3 objects after 5 minutes, and was not able to remember 2 even with prompting, nor could he recall a street address with prompting. Id. Dr. Tzetzo noted that he could

4

successfully recite details from a short story, suggesting decent reading comprehension skills. Id.

Plaintiff exhibited no obvious psychomotor retardation or agitation. Id. Speech was spontaneous, but there was an articulation problem. Id. Thought processes were coherent and he was at least of average intelligence. T. 257. Insight was marginal and judgment was fair. Id. Diagnoses were cognitive disorder, not otherwise specified with recent memory problems; traumatic brain injury; ongoing stressors include limited social support; and a Global Assessment of Functioning score of 58, indicating "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Amer. Psych. Assoc., Diagnostic and Statistical Manual of Mental Disorders, ("DSM") 32, 34 (4th ed., text revision, 2000).

Dr. Gordon Steinagle also conducted a "fitness-for-duty" examination on October 27, 2005. T. 259-61. Dr. Steinagle noted reports of Plaintiff having increased problems following instructions, angry outbursts at work, increasing forgetfulness, and a somewhat unkept appearance. Plaintiff acknowledged these issues and stated that it had been going on for an undetermined amount of time. T. 259. He could perform activities of daily living without problems. His physical examination was normal except that

his right leg was shortened approximately 3-4 inches due to a pelvic fracture sustained in a motor vehicle accident in the 1960s. T. 260. His neurological examination was also normal. T. 261. Dr. Steinagle determined that Plaintiff was unfit for duty, likely due to a central nervous system problem. Id.

On November 8, 2005, Dr. John Hargraves of the Employee Health Service stated that Plaintiff was unfit for duty as a mental health therapy aide based on the evaluations of Drs. Steinagle and Tzetzo. T. 253.

**B.    On and After November 15, 2005**

A magnetic resonance image of Plaintiff's brain dated November 23, 2005, showed right temporal and parietal volume loss, right temporal arachnoid cyst, and small hyperintensities possibly suggestive of white matter disease. T. 227, 291.

Plaintiff began seeing neurologist Dr. Peterkin Lee-Kwen in November, 2005, for evaluation of memory difficulties. T. 344. His diagnoses were memory loss with no evidence of Alzheimer's disease and decreased attention and concentration and B-12 deficiency. Id. On December 2, 2005, Dr. Lee-Kwen examined Plaintiff and noted decreased attention span and concentration, but his ability to name objects, repeat phrases, and speak spontaneously was good. T. 346. A mini mental status exam was 29 out of 30. Id. The examination results showed that Plaintiff's vitamin B-12 was less than 100pg/mL, MRI of the brain revealed slight atrophy, an enlarged

septum pellucidum, and an area of encephalomalacia on the right temporal lobe. Id. The results of Plaintiff's examinations were unchanged at a follow-up appointment in December, and Plaintiff reported that he felt better since a recent vitamin B-12 injection. T. 247, 347. Electroencephalogram findings were unremarkable. T. 248.

From late 2005 to 2009, Plaintiff saw Physician Assistant ("P.A.") Nancy Lance at Tri-County Memorial Hospital for B-12 injections and routine treatment. T. 273-81, 376-97, 421-30.

On January 24, 2006, neurologist Dr. George Kalonaros evaluated Plaintiff based upon reports of difficulty with memory and functioning in various capacities. Dr. Kalonaros noted that Plaintiff was somewhat unkempt, but not dirty, and had some difficulty with short-term memory. T. 223. He opined that Plaintiff "ha[d] a clinical picture consistent with mild cognitive impairment, which based on his history may very well be secondary to B-12 deficiency." Id. Although he believed Plaintiff could return to work in his normal capacity, a neuropsychological evaluation would be helpful in meeting a more exact determination regarding his ability to manage in the normal work environment. T. 223-24.

Plaintiff received a B-12 injection on January 26, 2006, and was noted to have some improvement in cognition since receiving the replacements. Dr. Lee-Kwen noted some difficulty with attention and

concentration, and doubted Alzheimer's or other pathological causes of dementia being present. T. 349. Other findings remained unchanged. Id.

Neuropsychologist Michael Santa Maria, Ph.D., conducted an independent medical examination of Plaintiff on February 6, 2006. T. 226-32. Plaintiff reported memory problems since November, 2005, which had improved with B-12 treatment. T. 226. Upon examination, Plaintiff exhibited speech of sub-par clarity, poorly enunciated and with words running together with frequency. T. 228. He recalled 1 of 3 words after a brief delay. He told Dr. Santa Maria that he "desperately wanted to return to work," but did not report any downturn in mood and the remainder of his mental examination was normal. T. 228. The neuropsychological report indicated findings of "impaired" or "mild deficit" in 8 of 11 areas in the category of learning and memory, and "normal" to "borderline" results in the remaining categories. T. 229. Plaintiff's memory was notably impaired, but he had high average overall intellectual abilities. T. 231. Dr. Santa Maria's assessment was mild cognitive impairment associated with TBI, and complicated by aging, arachnoid cyst, and B-12 deficiency. T. 228-31. Plaintiff was unlikely to regain capacity to handle the duties of his State job, even with B-12 treatment. T. 232. Shortly thereafter, Dr. Kalonaros reviewed Dr. Santa Maria's neuropsychological report and opined that

Plaintiff was not fit for duty in his usual capacity at work. T. 225.

Dr. Santa Maria evaluated Plaintiff again in August, October, and November of 2006. T. 265-69. His re-evaluations revealed that he had improved in fine motor speed and coordination bilaterally, reading ability, and spelling, but showed no improvement in concentration or processing speed. T. 268. Dr. Santa Maria opined that Plaintiff lacked the capacity to return to his prior work, but may seek vocational rehabilitation to an occupation that is less cognitively demanding. T. 269. Plaintiff again expressed a strong desire to return to work. Id.

Plaintiff continued to see Dr. Lee-Kwen periodically. T. 296-97, 299-300, 351-72. In March, 2006, Dr. Lee-Kwen prescribed Exelon for cognition and continued B-12 injections. T. 351. Physical and neurological examination findings were generally unchanged. He exhibited intermittent slurred speech. Memory difficulties slightly improved with Exelon. Id. In June, 2007, his memory loss and arachnoid cyst were stable. T. 296, 363. His memory function was noted to have subtly declined by December, 2007. T. 365. Subsequent visits through 2009 indicated this his condition was stable. T. 367-72. In January, 2010, examination findings were again unchanged, but with decreased attention and concentration. T. 414-15.

P.A. Lance completed a Primary Physician's Statement of Disability form on June 20, 2008, which indicated Plaintiff had memory loss and TBI, a prognosis of fair, and that he was permanently disabled from his State job. T. 271-72.

A June 27, 2008 Primary Physician's Statement of Disability form completed by Dr. Lee-Kwen indicated that Plaintiff had mild cognitive dysfunction, a prognosis of guarded, and that he was permanently disabled from performing the duties of his current position. T. 416-17.

Plaintiff underwent a psychological consultative examination on July 30, 2008 by Thomas Ryan, Ph.D. T. 307-10. He reported some difficulty with sleep, social withdrawal and usual life stress and worry, but denied depression, irritability, and other anxiety-related problems. Plaintiff stated that he had a great deal of difficulty with short-term memory, attention, and concentration, but his long-term memory was "okay." T. 307. He exhibited fair grooming and his speech reflected mild stammering. His attention and concentration and recent and remote memory skills were in tact, with cognitive functioning the average range. He was able to take care of his personal needs, had some friends, and spoke with his sister. Dr. Ryan opined that Plaintiff demonstrated no significant psychiatric condition or limitation in his ability to follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new

tasks, perform complex tasks, make adequate decisions, or generally relate well with others. T. 309.

A consultative neurologic examination performed the same day was unremarkable except for slight difficulty walking heel to toe. T. 311-13.

State Agency Review psychologist Martha Totin reviewed the record on October 8, 2008, and found that Plaintiff had a history of mild cognitive impairment, and had only mild limitations in the areas of maintaining social functioning and maintaining concentration, persistence, or pace, with no other limitations. T. 316-28. Dr. Totin found no episodes of decompensation, and found Plaintiff's impairment was found to be non-severe. T. 326, 328.

On March 23, 2009, Plaintiff was consultatively examined by neurologist Dr. J. Maurice Hourihane. T. 418-19. Upon examination, Plaintiff was slightly disheveled with slurred speech, but was pleasant and scored 28 out of 30 on a mini-mental status exam. T. 419. He had no problems with activities of daily living, including driving, self-care, and balancing a checkbook. T. 418. Dr. Hourihane found that Plaintiff was neurologically stable with no history of substantial deterioration. T. 419.

On August 11, 2009, a review physician completed a Disability Review Team Certificate finding Plaintiff disabled based on a mental residual functional capacity assessment showing marked limitations in areas of understanding and memory, and maintaining

concentration and persistence, social interaction, and adaptation. T. 420.

A Mental Residual Functional Capacity form completed by P.A. Lance on November 16, 2009, indicated that due to cognitive dysfunction, Plaintiff had marked or extreme limitations in all but three functional areas, with the remaining areas showing moderate limitations. T. 373-74.

### III. Non-Medical Evidence

On September 29, 2005, Treatment Team Leader Renee Szarowicz requested an employee health examination of Plaintiff due to his behavior at work over the past year, specifically, using foul language, talking to himself, and being visibly upset, and needing reminders to follow tasks that had been repeatedly explained to him. T. 249. He could not remember or recall without numerous prompts, had problems with focus, and had a low distress tolerance. Id. After a training in basic computer skills and data entry, he did not have recall, and would get confused and become upset. T. 250.

Plaintiff was born in 1950, completed college and received a master's degree in counseling. T. 39, 169. Plaintiff testified that he lived alone and worked as a mental health therapy aide for 21 years until he began having problems with his memory. T.34-35, 41. He later applied for jobs as a bus aide and at a restaurant, but he

was not hired. T. 42. When asked whether he applied for disability retirement, he stated that he could not remember. T. 37-38.

Plaintiff had a driver's license, but his sister drove him to the hearing. T. 34. As a teenager, Plaintiff had a brain injury, and the majority of his problems were with short-term memory. He couldn't watch much television or read often due to concentration problems, was unable to follow-complex instructions, and slept around five hours per night. He stated that vitamin B-12 shots helped his memory somewhat, and that he adjusted by making notes to himself and using a box system for his medication. T.41, 43-46, 52

With regard to daily activities, Plaintiff told the ALJ that he could prepare simple meals, do laundry, dishes, and grocery shopping, performed yard work, could drive a car, and was a volunteer firefighter that directed traffic when needed. T.48, 53-55. He could pay bills and maintain a checking account with reminder notes. T. 48-49.

Plaintiff also testified that he could not stand for long periods of time due to foot problems. T. 52.

The ALJ posed a hypothetical to vocational expert James Phillips involving an individual of Plaintiff's age, education, and work experience, who was limited to simple, repetitive, and routine tasks; little in the way of changes in work assignments, or judgments in making work assignments; one- or two-step instructions due to memory difficulties or tasks that could be performed in

checklist form. T. 62-63. Mr. Phillips responded that such a person could perform the light, unskilled jobs of line packer or inspector/packer. T. 63-65.

## IV.  **Analysis**

### A.  **Treating Source Opinion**

Plaintiff contends that the ALJ did not properly assess the opinions of his treating physicians. Pl. Mem. 10-13.

Under the Commissioner's regulations, a treating physician's opinion is entitled to controlling weight, provided that it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2). However, "the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999), citing 20 C.F.R. § 404.1527(d)(4).

The Commissioner need not grant controlling weight to a treating physician's opinion to the ultimate issue of disability, as this decision lies exclusively with the Commissioner. See 20 C.F.R. § 404.1527(d)(1); Snell, 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

Here, the ALJ did not give controlling weight to the November 16, 2009, Mental Residual Functional Capacity form

completed by P.A. Lance because she was not a doctor, and afforded
it little weight because it was inconsistent with the medical
record as a whole. T. 18. He also gave little weight to the
Disability Review Team Certificate because it was inconsistent with
the consultative examination findings and the opinions of
Drs. Kalonaros, Santa Maria, and Lee-Kwen. Id. Finally, he gave
"more weight" to the opinions of Drs. Kalonaros, Santa Maria, and
Lee-Kwen, as they were consistent with one another and with the
consultative examination findings. Id.

It is true that the opinions of P.A. Lance, Dr. Lee-Kwen,
Dr. Kalonaros, Dr. Santa Maria, and the State Disability review
physician concluding that Plaintiff was unable to return to his
prior work were not entitled to special significance under the
treating physician rule. See 20 C.F.R. § 416.927(d).

The Court is also cognizant that P.A. Lance was an "other
source" under the regulations. While an "other source" opinion
generally is not treated with the same deference as a treating
physician's opinion, consideration of an opinion from someone who
is not an "acceptable medical source" is particularly important
where that provider is the "sole source that had a regular
treatment relationship with plaintiff." White v. Comm'r, 302
F.Supp.2d 170, 176 (W.D.N.Y. 2004) (citation omitted). P.A. Lance
was Plaintiff's primary care provider of several years who
submitted a function-by-function analysis, setting forth the nature

15

and severity of Plaintiff's impairments, finding extreme and marked limitations in several functional areas. T. 373-75. She had previously made identical findings in a Primary Physician's Statement completed on June 20, 2008. T. 272.

Significantly, Lance's Mental Residual Functional Capacity report was consistent with the Primary Physician's Statement completed by Dr. Lee-Kwen, Plaintiff's treating neurologist, which indicated that Plaintiff had a progressive neurologic condition that disabled him from his current work and that he was not expected to substantially improve function with treatment, and also with the Disability Review Team Certificate, which noted that based on multiple evaluations, including a mental residual functional assessment, Plaintiff had marked limitations in areas of understanding and memory, sustaining concentration and persistence, social interaction, and adaptation. T. 417, 420.

These opinions are entitled to greater weight than that of the consultative psychologist and neurologist, who only examined Plaintiff once, and found no significant limitations in any functional area. See SSR 06-03p, 2006 WL 2329939, at *2 ("depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source' "such as when the "other source" "has seen the individual more often than the treating source and

16

has provided better supporting evidence and a better explanation for his or her opinion").

Although the ALJ stated that he gave "more weight" to the opinions of Drs. Santa Maria, Kalonaros, and Lee-Kwen, he incorrectly noted that they were consistent with the consultative examination findings. Rather, the treatment notes from these sources were in agreement with one another that Plaintiff had notable memory loss, unkept appearance, and slurred speech, with some level of impairment as to insight and judgment. The consultative examinations, on the other hand, were unremarkable and revealed no limitations.  T. 247-48, 296-97, 300, 346, 349-72, 414-15, 419.

Finally, to the extent that the opinions of these treating sources were inconsistent with their own examination results, which the ALJ pointed out showed that Plaintiff was "neurologically stable," the ALJ was duty-bound to "seek any clarification of the perceived inconsistences in [a treating physician's] findings about the claimant's [ ] limitations," and failure to do so amounts to legal error requiring remand. Rolon v. Comm'r, 994 F.Supp.2d 496, 504 (S.D.N.Y. 2014).

The Court concludes that the ALJ erred in his consideration of these treating physician opinions, and that this error requires remand.

17

### B.    Credibility Assessment

Plaintiff also challenges the ALJ's credibility determination, alleging that he used "boilerplate" language and did not properly apply Social Security Ruling ("SSR") 96-7p. Pl. Mem. 13-15.

To establish disability, there must be more than subjective complaints. There must be an underlying physical or mental impairment, demonstrable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 416.929(b); accord Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983). When a medically determinable impairment exists, objective medical evidence must be considered in determining whether disability exists, whenever such evidence is available. 20 C.F.R. § 416.929(c)(2). If the claimant's symptoms suggest a greater restriction of function than can be demonstrated by objective medical evidence alone, consideration is given to such factors as the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness, and adverse side-effects of medication; and any treatment or other measures used to relieve pain. 20 C.F.R. § 416.929(c)(3); see SSR 96-7p, (July 2, 1996), 1996 WL 374186, at *7. It is well within the Commissioner's discretion to evaluate the credibility of a plaintiff's testimony and render an independent judgment in light of the medical findings

18

and other evidence regarding the true extent of symptomatology. Mimms v. Sec'y, 750 F.2d 180, 186 (2d Cir. 1984); Gernavage v. Shalala, 882 F.Supp. 1413, 1419 (S.D.N.Y. 1995).

In assessing Plaintiff's credibility, the ALJ acknowledged that he had a "good steady work record, which does raise a favorable inference of an individual well motivated to work within their [sic] capabilities," but found that other evidence outweighed this inference. T. 18. Specifically, Plaintiff's receipt of retirement benefits, the fact that his physicians stated that he was a good candidate for vocational rehabilitation, and that "based upon his treating sources, he would not have been eligible for disability retirement." Id. The ALJ concluded that Plaintiff's subjective complaints were not credible as they were inconsistent with the RFC assessment. T. 14.

First, the ALJ improperly used Plaintiff's receipt of a retirement pension as a means to impugn his credibility. See Rinker v. Chater, No. 95 Civ. 3923, 1997 WL 47791, at * 9 (S.D.N.Y. Feb. 6, 1997) (noting a split in authority but opining that claimants receiving pensions should not "be presented with a more difficult row to hoe" in obtaining SSI). Other courts within this Circuit have reached similar conclusions. See Goldthrite v. Astrue, 535 F.Supp.2d 329, 337–38 (W.D.N.Y. 2008) ("[T]his court finds it problematic that a Plaintiff would be found less credible simply because they are of limited means. The fact that the Plaintiff was

receiving other income from public assistance does not, by itself, mean that she is less credible when testifying about her pain."); Cordero v. Astrue, No. 11 Civ. 5020, 2013 WL 3879727, at *26 (S.D.N.Y. July 29, 2013) (holding that it was "clearly improper" for the ALJ to use plaintiff's receipt of a monthly pension and her husband's income as a means to challenge her credibility); Parikh v. Astrue, 07-CV-3742, 2008 WL 597190, at *8 n.10 (E.D.N.Y. Mar. 2, 2008) ("The ALJ also, curiously, took the fact that Parikh had a pending application for a state disability pension to impeach her credibility by giving her a disincentive to work while waiting for the pension to be approved . . . I am at a loss to understand why Parikh's situation is different in this regard than the situation of any claimant of Social Security disability benefits . . . .")

This is not a case where Plaintiff had a "financial disincentive to his returning to work." Rinker, 1997 WL 47791 at *9. To the contrary, Plaintiff continued to seek work after being advised he was unfit to perform his previous duties as a mental health therapy aide. T. 14. It appears that the ALJ used Plaintiff's desire to work against him to undermine his subjective complaints. A claimant, such as Plaintiff, "with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983); accord, Horan v. Astrue, 350 Fed. Appx. 483, 485 (2d Cir. 2009).

Second, the ALJ's statement that "based upon [Plaintiff's] treating sources, he would not have been eligible for disability retirement," does not find support in the record. There is nothing in the treatment notes or in the relevant civil service records discussing Plaintiff's eligibility (or lack thereof) for state disability retirement. T. 18; see, e.g., Andrews v. Colvin, No. 12-CV-6651, 2013 WL 5878114, *12 (W.D.N.Y. 2013) ("[t]he ALJ's recitation of the facts contained in the credibility assessment must be accurate and contain an explanation why they undermine the credibility of the witness").

Third, with regard to his daily activities, the ALJ noted that Plaintiff was able to perform self-care, drove a car, maintained a checking account, and that he compensated for his memory difficulties by making lists and notes. T. 19. The Court points out, however, that Plaintiff's testimony at the administrative hearing showed obvious signs of memory impairment.[3] He could not recall when or if he applied for New York State disability retirement. T. 37-39. Although he made adjustments by writing himself notes, he stated that he would find the notes a week later after washing them with the laundry. T. 45-46. Plaintiff testified that he did not watch much television or read because if he read a line or two he would not be able to remember what happened. T. 48.

---

[3] It also appears that Plaintiff had articulation troubles during the hearing, which was consistent with multiple medical evaluations indicating slurred and stammering speech. T. 31-56.

Finally, he told the ALJ that he volunteered for the local fire department directing traffic, and was able to do so because remembering the streets in his town did not require instructions and did not involve his short-term memory. T. 55-56. In this regard, the ALJ did not accurately summarize Plaintiff's hearing testimony, and, combined with the errors above, his credibility finding cannot be said to be supported by substantial evidence. See Aragon-Lemus v. Barnhart, 280 F.Supp.2d 62, 70 (W.D.N.Y. 2003) (finding the ALJ's credibility analysis not supported by substantial evidence in part because the ALJ mischaracterized the plaintiff's testimony).

In summary, although the ALJ provided specific reasons for discounting Plaintiff's credibility, at least two of the proffered reasons do not support his determination. These factual errors require remand. See Horan v. Astrue, 350 Fed. Appx. 483, 485 (2d Cir. 2009) (remand appropriate because the ALJ's credibility determination was based on factual errors); accord Ferguson v. Colvin, 12-CV-0033, 2014 WL 3894487, at *10-*11 (W.D.N.Y. Aug. 8, 2014) (remanding for factual error's in ALJ's credibility determination and legal error in failing to give favorable consideration to Plaintiff's work history); but see Sesa v. Colvin, No. 13-CV-2670, 2014 WL 3858404, (S.D.N.Y. Aug. 06, 2014) (finding error in ALJ's adverse credibility determination based on plaintiff's receipt of long-term benefits was error, but declining

to remand where the credibility determination was independently supported by other substantial evidence).

Because the errors related to the credibility assessment requires remand, the Court need not address Plaintiff's remaining contention with respect to the ALJ's step five finding that Plaintiff could perform other work. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by him.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings (Dkt. #8) is denied, Plaintiff's cross-motion for judgment on the pleadings (Dkt. #11) is granted, and this matter is remanded to the Commissioner for the reasons stated above for further administrative proceedings pursuant to 42 U.S.C. § 405(g), sentence four.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____

MICHAEL A. TELESCA
United States District Judge

Dated:     Rochester, New York
           June 1, 2015

23